IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| TINA L. DOOLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 11-0281-CV-W-REL-SSA |
| MICHAEL J. ASTRUE, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Tina Dooley seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in failing to develop the record in regard to plaintiff's mental impairment, in finding plaintiff not credible, and in failing to give adequate weight to plaintiff's treating physician. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

*I.* **BACKGROUND**

On September 28, 2007, plaintiff applied for disability benefits alleging that she had been disabled since July 20, 2007. Plaintiff amended her onset date to May 29, 2009, during the administrative hearing because she worked at the substantial gainful activity level after July 20, 2007 (Tr. at 19). Plaintiff's disability stems from migraines and seizures. Plaintiff's application was denied initially. On September 17, 2009, a hearing was held before an Administrative Law Judge. On November 3, 2009, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On January 18, 2011, the Appeals Council denied plaintiff's

request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

*III.*    *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS*

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.    Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.    Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

Case 4:11-cv-00281-REL   Document 13   Filed 07/12/12   Page 3 of 32

5.      Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff and vocational expert Richard Sherman, in addition to documentary evidence admitted at the hearing.

## A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

Plaintiff earned the following income from 1986 though 2009, shown in both actual and indexed figures:

| Year | Actual | Indexed |
|------|--------|---------|
| 1986 | $ 916.44 | $1,955.06 |
| 1987 | 3,319.00 | 6,656.00 |
| 1988 | 0.00 | 0.00 |
| 1989 | 39.88 | 73.32 |
| 1990 | 222.00 | 390.13 |
| 1991 | 2,362.79 | 4,003.01 |
| 1992 | 0.00 | 0.00 |
| 1993 | 0.00 | 0.00 |
| 1994 | 0.00 | 0.00 |
| 1995 | 3,717.46 | 5,560.31 |
| 1996 | 2,757.63 | 3,932.35 |
| 1997 | 926.80 | 1,248.74 |
| 1998 | 1,569.88 | 2,010.01 |
| 1999 | 4,093.25 | 4,964.18 |
| 2000 | 2,171.76 | 2,495.83 |
| 2001 | 8,838.38 | 9,920.57 |
| 2002 | 7,138.49 | 7,932.98 |
| 2003 | 5,885.41 | 6,384.37 |

4

|      |          |          |
|------|----------|----------|
| 2004 | 9,417.64 | 9,762.23 |
| 2005 | 1,435.00 | 1,435.00 |
| 2006 | 2,130.15 | 2,130.15 |
| 2007 | 5,513.17 | 5,513.17 |
| 2008 | 7,678.43 | 7,678.43 |

(Tr. at 103-104, 109).

**Function Report**

In a Function Report dated October 20, 2007, plaintiff reported that she gets up and drinks an Ensure, goes back to bed, cries most of the day due to her pain, tries to get up for her kids when they come home, but then goes back to bed for the night (Tr. at 147-154). Plaintiff is able to cook pork chops, green beans and potatoes. She does laundry. She is able to go out "every day when I'm not in pain" and when she goes out, she drives. She can shop once a week for one to two hours. She watches movies on television and sings. She can walk for two minutes before needing to rest for 20 to 30 minutes. She can following written and spoken instructions and handle changes in routine.

**B.     SUMMARY OF TESTIMONY**

During the September 17, 2009, hearing, plaintiff testified; and Richard Sherman, a vocational expert, testified at the request of the ALJ.

**1.     Plaintiff's testimony.**

At the time of the hearing plaintiff was 39 years of age and is currently 42 (Tr. at 13, 20). She has five children:  a 20-year-old daughter, a 19-year-old son, a 16-year-old daughter, an 11-year-old daughter, and a four-year-old son (Tr. at 23). She has an 11th grade education and has a Certified Nurse Assistant certificate (Tr. at 20-21). At the time of the hearing, plaintiff was working for a temporary agency called Nurse Finders (Tr. at 21). She calls them when she feels like working (Tr. at 21). Until May of 2009, plaintiff worked for a minimal health center (Bridgewood), but she left that job because her seizures were getting

worse -- she began working for the temporary agency when she left Bridgewood (Tr. at 21). Plaintiff has always worked as a certified nurse assistant except for in 1995 when she worked as a cashier (Tr. at 22).

Plaintiff suffered from seizures when she worked at Bridgewood (Tr. at 23). Her employer knew that she could not bend over without falling over and she could do no lifting, so she was assigned to "certain residents" (Tr. at 23-24). When she had a seizure at work she would have to be rushed to the hospital (Tr. at 24). Plaintiff's seizures started in July 2007 which was her original alleged onset date (Tr. at 24). Her first seizure occurred when she was on her way to her daughter's school -- she had a migraine and had to pull over because she felt funny. When she got to the school, she felt faint and when she stood up she was shaking and then she blacked out and bumped her head (Tr. at 24). She has had seizures since then (Tr. at 24). Plaintiff's migraine headaches began in February 2007 (Tr. at 24).

Plaintiff takes Topamax for her seizures (Tr. at 21). When asked how often she has seizures, she responded, "My last seizure was last month, so -- I went to the hospital last Tuesday, and I had one Thursday." (Tr. at 21). Eighty percent of her seizures occur while she is sleeping (Tr. at 22). Sometimes her jaw will start shaking before she gets a seizure (Tr. at 26). Most of the time she passes out from the seizure and wakes up in the hospital (Tr. at 26). When she gets home from the hospital, she sleeps for five or six hours (Tr. at 28). She has to go to the hospital at least four times a month (Tr. at 26). Sometimes plaintiff has a seizure and is not taken to the hospital, but "most of the time" she ends up in the emergency room because her oxygen gets so low (Tr. at 28).

Plaintiff's migraine headaches have gotten worse -- she is in constant pain no matter what medication she takes (Tr. at 25). She has at least three migraine headaches a week during which she is unable to function (Tr. at 25-26). That lasts for three to four hours (Tr. at 26). Plaintiff takes Dilantin for migraines, and her Topamax is also for migraines (Tr. at 22).

6

She has suffered from migraine headaches for two and a half years (Tr. at 22-23).

Plaintiff takes medication for high blood pressure (Tr. at 28).

Her medication makes her sleepy (Tr. at 29).

## 2.    Testimony of plaintiff's son.

Plaintiff's son lives with her and at the time of the hearing he was not working (Tr. at 29-30).  He spends his day going out with his friends or playing basketball (Tr. at 30). Plaintiff spends her entire day in bed every day because her head hurts (Tr. at 30).  They have gotten worse because at first she would try to get up, but now "there's nothing like that" (Tr. at 31).

When plaintiff has a seizure, she starts shaking and her head "starts to go crazy" (Tr. at 31).  Then you cannot see her eyes (Tr. at 31).  They call the cops and roll plaintiff over (Tr. at 31-32).  The jerking lasts one to two minutes, then she goes to the hospital (Tr. at 32).  When she gets home, she goes straight to sleep for the rest of the day (Tr. at 32).

Sometimes they do not take her to the hospital because his step dad does not want them to -- he just wants to stay with her (Tr. at 32).  When asked why he would not want plaintiff taken to the hospital, her son said, "[H]e don't want the bills, I guess, I don't know.  He just stay with her." (Tr. at 32).  Plaintiff's son has seen her have a seizure about five times (Tr. at 33). All of them were at home except once when they were eating at a Chili's Restaurant (Tr. at 33). His step dad took plaintiff to the hospital on that occasion (Tr. at 33).

## 3.    Vocational expert testimony.

Vocational expert Richard Sherman testified at the request of the Administrative Law Judge.   The first hypothetical involved a person with no exertional limitations but who could not work at unprotected heights, could not be around hazards or machineries, should not drive, and could not be exposed to extreme heat or cold (Tr. at 34).  The vocational expert testified that such a person could perform plaintiff's past relevant work as a certified nurse

7

assistant (Tr. at 34). She could also work as an office helper, a photo/copy machine operator, or an electronic assembler (Tr. at 34). There are 5,800 officer helpers in Missouri, 2,150 in the Kansas City area (Tr. at 35). There are 1,900 photo/copy machine operators in Missouri, 550 in Kansas City (Tr. at 35). there are 4,500 electronic assemblers in Missouri, 2,200 in Missouri (Tr at 35).

The second hypothetical was the same as the first except the person would miss more than one day of work per month due to illness -- the person could not work (Tr. at 35).

The third hypothetical was the same as the first but the person would need to lie down during the day at unscheduled intervals -- the person would not be able to work (Tr. at 35).

C.  *SUMMARY OF MEDICAL RECORDS*

On September 7, 2006 (almost three years before plaintiff's amended alleged onset date), plaintiff presented to Menorah Medical Center reporting chest pain and left arm numbness (Tr. at 225-226). Stress echocardiogram results revealed a low likelihood of fixed obstructive coronary artery disease (Tr. at 223). Brain MRI was negative (Tr. at 229).

Plaintiff returned to Menorah Medical Center on September 9, 2006, with continued reports of chest pain and dyspnea (shortness of breath) (Tr. at 230-234). The impression was atypical chest pain, likely musculoskeletal, versus possible stress-induced. There was no obvious evidence of intrinsic lung problems. Tommy Ko, M.D., recommended plaintiff take non-steroidal anti-inflammatories and consider treatment for stress. He indicated that if her symptoms persisted, he would consider pulmonary function testing to evaluate for asthma. Plaintiff was discharged on September 10, 2006.

On September 18, 2006, plaintiff was seen at Family Medical Group for follow up after her hospitalization (Tr. at 356). Her current medications were Lexapro (treats anxiety and depression), Voltaren (treats arthritis pain and inflammation), Valium (treats anxiety, muscle spasms and alcohol withdrawal), aspirin, and Vicodin (narcotic). The examining physician

8

noted that plaintiff's mood and affect were abnormal. She instructed plaintiff to continue Lexapro for depression.

On October 20, 2006, plaintiff returned to Family Medical Group and saw W. Russell King, M.D., her primary care physician (Tr. at 355). Plaintiff complained of continued chest tightness. Dr. King noted that spirometry testing revealed mild obstructive disease. He diagnosed asthma and prescribed Albuterol.

On January 2, 2007, plaintiff saw Dr. King and reported right knee pain, swelling and numbness (Tr. at 354). She weighed 235 pounds. Dr. King noted tenderness over the right lateral knee. He prescribed a knee brace and Naproxen (non-steroidal anti-inflammatory).

On January 16, 2007, plaintiff told Dr. King her knee still hurt (Tr. at 353). He assessed probable medial meniscal tear and ordered an MRI.

On February 27, 2007, plaintiff returned to the ER at Menorah Medical Center and reported having fainted (Tr. at 321-323). Her ECG was normal. Chest x-rays revealed no evidence of pulmonary embolism and no acute chest disease. CT of the brain without contrast was negative.

On March 2, 2007, plaintiff saw Dr. King to follow up her recent ER visit (Tr. at 352). She reported she lost consciousness for five to ten minutes and was taken to the ER. There were no cardiac findings. On physical exam, she had pain to chest palpation and wheezing in her right lung base. Her mood and affect were flat. She weighed 236.8 pounds. Dr. King instructed her to continue Vicodin for chest wall pain and continue Levaquin (antibiotic) and nebulizer (Albuterol) for upper respiratory infection.

On March 27, 2007, plaintiff was seen at the ER at Menorah Medical Center with reports of abdominal pain (Tr. at 315). Abdominal x-rays revealed nonobstructive bowel gas pattern.

On April 10, 2007, Dr. King treated plaintiff for acute bronchitis (Tr. at 351). Plaintiff weighed 239.4 pounds.

On June 28, 2007, plaintiff returned to the ER at Menorah Medical Center and reported chest pain and shortness of breath (Tr. at 297). She also reported she had been suffering from a headache for four days. CT of the head was negative (Tr. at 312). An ECG was normal (Tr. at 303). Plaintiff was discharged to home with clinical impression of acute chest pain and acute cephalgia (headache) (Tr. at 298).

Plaintiff returned to the ER on June 30, 2007, with continued reports of chest pain and headache (Tr. at 281). She had symptoms of nausea, vomiting, shortness of breath, sweating, and dizziness. Her chest pain radiated into her arm and back. EKG was normal. Cervical spine x-rays were normal (Tr. at 294-295). Plaintiff was discharged to home with clinical impression of headache and cervical radiculopathy. She was given Medrol (a corticosteroid that blocks inflammation).

On July 20, 2007, plaintiff was seen at the ER at Menorah Medical Center (Tr. at 273-274). She stated she had been suffering from a headache for three weeks and also described neck pain on the left. She had associated symptoms of tingling in her left arm. She was given Vicodin and offered an MRI, but plaintiff preferred to wait so she could have an open MRI. She was discharged with clinical impression of acute headache with cervical pain.

Three days later, on July 23, 2007, plaintiff returned to the ER and reported a headache "for four weeks" and neck pain on the left side "for weeks" (Tr. at 266-267). She was given Morphine and Phenergan (for nausea) and scheduled for open MRI.

On July 26, 2007, plaintiff was seen by Dr. King for follow up of her recent ER visit (Tr. at 350). She weighed 239.8 pounds and stood five feet six inches tall. Her blood pressure was 140/90. Physical exam revealed decreased range of motion of the neck. Dr. King ordered an MRI of plaintiff's spine.

On July 30, 2007, plaintiff underwent an MRI of her cervical spine (Tr. at 357). The results were normal.

On August 4, 2007, plaintiff returned to the ER and continued to report moderate to severe headache with associated nausea, vomiting, tingling in her left arm and blurred vision (Tr. at 251-252). Her pain was exacerbated by light, noise, movement and position. Head CT without contrast was normal (Tr. at 264). Plaintiff was discharged with medications of Phenergan and Vicodin.

On August 8, 2007, plaintiff saw Samuel Lehman, M.D., a neurologist (Tr. at 235-236). He noted that plaintiff had gone to the ER at Menorah Medical Center on August 4, 2007, with escalating headaches. CT of the head was normal. Plaintiff reported she had suffered from headaches for several years, but she noticed the onset of a different type of headache in June 2007. She described very sharp pain in the left occipital and temporal areas. She went to the ER at that time and had tried various treatments, none of which had been successful. Plaintiff described her pain as a tingling sensation of the scalp or burning head in the scalp. Sometimes she would have pain going into her left arm. She had been taking Vicodin and ibuprofen without benefit. Neurological testing was unremarkable. Dr. Lehman's impression was most likely migraines versus greater occipital neuralgia; but he noted she could have both conditions. He recommended a therapy trial of Gabapentin (treats nerve pain).

On August 16, 2007, plaintiff was brought by ambulance to the ER at Menorah Medical Center after having a headache followed by an episode of shaking (Tr. at 239-244). The shaking was on her right side only. Plaintiff described the headache as the worst of her life. Clinical impression was migraine headache and syncope (fainting) versus new onset of seizures.

On August 21, 2007, plaintiff presented to Dr. King and reported suffering a headache since June 28, 2007 (Tr. at 349). She reported she had seen Dr. Lehman about her seizures.

11

Dr. King assessed headache, migraine type; and seizure. He prescribed Topamax, which treats seizures.

On September 18, 2007, plaintiff told Dr. King her headaches were getting worse (Tr. at 348). She weighed 227.8 pounds. Dr. King increased her dose of Topamax.

On November 12, 2007, plaintiff went to the ER at St. Joseph Medical Center and reported left neck pain (Tr. at 452-353). She explained she had been in a car accident four days earlier and at that time was given Motrin for pain. She reported minimal relief with Motrin. Plaintiff was given Valium and advised to follow up with her primary care physician.

On November 15, 2007, plaintiff presented to Providence Medical Center for EEG to evaluate syncope (fainting) (Tr. at 342). Results were normal. Plaintiff did have an episode of apparent altered consciousness, but there was no accompanying abnormality on the EEG or ECG leads. The findings suggested a non-epileptic seizure disorder. Dr. King made a notation on this report to call plaintiff: "EEG is normal so she has pseudoseizures. There is not a treatment for pseudoseizures except for psychiatric evaluation."

By letter dated December 4, 2007, Fernando Egea, M.D., stated he had examined plaintiff on November 19, 2007 (Tr. at 324-325). He reported that, within a reasonable degree of medical certainty, it was his opinion that plaintiff suffered from right knee cruciate ligament laxity, edema and pain; and right ankle tendinitis with secondary limitation in the range of motion of the ankle. He noted this was a result of injuries sustained at work December 19, 2006, at K-Mart. He rated this injury as a partial and permanent disability of 53% to the right lower extremity.

On December 25, 2007, plaintiff presented to the ER at Menorah Medical Center after experiencing a seizure that evening (Tr. at 494). She had no postictal[1] symptoms. Head CT

---

[1]The period of confusion following a seizure.

was negative (Tr. at 500).

On December 30, 2007, plaintiff returned to the ER and reported she had experienced multiple episodes of seizure that day (Tr. at 510-511). She was taking Topamax. Clinical impression was seizure. Plaintiff was given Ativan (treats anxiety).

On January 3, 2008, plaintiff reported she had a headache and had been vomiting for four days (Tr. at 483-484). Clinical impression was headache, vomiting, dehydration, and urinary tract infection. She was given Phenergan (for nausea) and Bactrim (antibiotic).

On January 14, 2008, plaintiff returned to the ER at St. Joseph Medical Center and reported chest pain, headache, neck stiffness, and fever (Tr. at 442-444). CT of the head showed no abnormalities and EKG showed a normal sinus rhythm. Her headache was treated with morphine and Zofran for nausea with only partial improvement. She was given Benadryl, but then began to have tremors which appeared to be volitional. She was mainly shaking her jaw and had twitching of her eyelids, but she was conscious. Clinical impression was chest pain, noncardiac; peripheral neuropathy;[2] and cephalgia (headache). She was given a prescription of Ultram[3] for pain and referred to her primary care physician and neurologist for follow up.

Plaintiff returned to the ER on January 20, 2008, and reported her headache had persisted (Tr. at 434-435). She said she had been taking Tramadol (also known as Ultram) without any relief. She was also taking Topamax. Clinical impression was influenza. She was given Ibuprofen 800 mg for pain.

---

[2]Peripheral neuropathy, a result of nerve damage, often causes numbness and pain in your hands and feet. People typically describe the pain of peripheral neuropathy as tingling or burning, while they may compare the loss of sensation to the feeling of wearing a thin stocking or glove.

[3]A narcotic-like pain reliever.

On January 22, 2008, plaintiff saw Dr. King for follow up (Tr. at 347). She weighed 228 pounds. Dr. King noted that plaintiff had been at the ER on January 14, 2008, for headache, chest pain, and seizures and returned on January 20, 2008. Dr. King increased her dose of Topamax.

On March 27, 2008, plaintiff was admitted to St. Joseph Medical Center (Tr. at 326). Plaintiff complained of atypical migraine for at least a year to a year and a half and atypical chest pain. Plaintiff underwent consultation with Arthur Allen, M.D. He noted plaintiff had a history of recurrent migraines and generalized tonic-clonic seizures,[4] though she had never had a migraine associated with neurologic symptoms. Plaintiff reported she had a headache the previous night, then woke up and noted her right upper extremity "went numb and weak." Her pain intensified and she noted tingling in her right mid face and chin and subsequently went to the ER. Head CT was negative. Plaintiff reported she had been in the ER in March 2008 and had experienced five to six convulsions that day. Dr. Allen noted that her ER physician at that time raised the possibility of seizures versus pseudo seizures. Dr. Lehman, her neurologist, had placed her on Topamax and it provided some element of control. On neurologic exam, Dr. Allen noted moderate weakness for grip and attempts at nose-to-finger and knee flexion. Foot tapping was reduced on the right. Motor function appeared full on the left. Dr. Allen's clinical assessment was recent onset of headache associated with right hemi sensory motor dysfunction, cause uncertain, question stroke in evolution; history of migraines, not taking oral contraceptives and not pregnant; and history of generalized tonic-clonic seizures on Topamax. He recommended MRI and MRA[5] (Tr. at 327-329). In a discharge

_____

[4]A generalized tonic-clonic seizure is a seizure involving the entire body. It is also called a grand mal seizure.

[5]A magnetic resonance angiogram (MRA) is a type of magnetic resonance imaging (MRI) scan that uses a magnetic field and pulses of radio wave energy to provide pictures of blood vessels inside the body. In many cases MRA can provide information that cannot be obtained

summary on March 28, 2008, Richard Harlow, M.D., noted that plaintiff's chest pain was clearly musculoskeletal. MRI and MRI angiogram were normal and there were no neurologic findings. Dr. Allen discharged plaintiff to home to be followed by her primary care physician for continued treatment of her migraine issues (Tr. at 326)

On August 2, 2008, plaintiff was seen the ER at St. Joseph Medical Center for evaluation of a possible seizure (Tr. at 430-431). She reported she had developed pain in the left side of her neck that had radiated to the back of her head. She said it felt like a migraine. She fell asleep and her family indicated they thought she was having a seizure in her sleep. Paramedics were summoned and she was brought to the hospital. She complained of some occipital pain which was typical for her migraines. Plaintiff remained stable in the ER with no type of seizure activity. Clinical impression was cephalgia (headache), now resolved, and possible seizure activity reported by family. The attending physician noted this was possible given her underlying seizure disorder, but she was currently medicated and stable.

On October 24, 2008, plaintiff was seen at the ER at St. Joseph Medical Center and reported chest wall pain, dizziness, and headache (Tr. at 422-424). Physical exam revealed tenderness to palpation over the midsternum. EKG and chest x-ray were normal. Plaintiff was given Toradol (non-steroidal anti-inflammatory), Compazine (for nausea) and Benadryl. She was also given a gastrointestinal cocktail. Clinical impression was chest wall pain, gastro-esophageal reflux disease, and migraine headache. Pepcid (stomach acid reducer) was prescribed.

Plaintiff returned to the ER on October 27, 2008, and reported swelling in her right leg (Tr. at 416-418). She said she had a small stroke back in March, had headaches and migraines daily, and had a history of seizures, the last one three weeks earlier. Venous

_____

from an X-ray, ultrasound, or computed tomography (CT) scan.

ultrasound showed no definite deep venous thrombosis in the right leg. CT of the head was negative. Physical exam revealed the right leg was slightly weaker than the left and had 1+ swelling. Clinical impression was leg swelling. She was instructed to follow up if symptoms became worse or she began having neurological dysfunction.

On October 29, 2008, plaintiff presented to the ER with headache and chest pain (Tr. at 411-412). She had been taking her Pepcid and Topamax. Chest x-ray and EKG were negative. Diagnosis was esophageal reflux and migraine.

On November 6, 2008, plaintiff saw Dr. King and requested that her medication be changed because Topamax was not effective (Tr. at 346). She said her migraine headaches had been bad and she had had multiple ER visits recently. She also reported right knee and leg swelling. On physical exam, Dr. King noted systolic click. Plaintiff weighed 224.6 pounds. Dr. King assessed mitral valve prolapse,[6] migraine, hypertension, and stable asthma.

On November 8, 2008, plaintiff returned to the ER at St. Joseph Medical Center and reported she had experienced two seizures that night (Tr. at 405-406). One lasted for a few minutes, the other one lasted maybe even longer than that. Her last seizure was two months earlier. Plaintiff stated she had been taking her Topamax regularly. She said she also continued to have some left-sided chest pain. The attending physician noted that plaintiff was not postictal and was clear and alert. Head CT and chest x-ray were negative. Plaintiff was given Ativan (treats anxiety) and pain medication. The clinical impression was seizure disorder and chronic chest pain.

On November 11, 2008, plaintiff underwent echocardiogram at Providence Medical Center to evaluate a history of mitral valve prolapse (Tr. at 341). The results revealed only trace mitral regurgitation. Dr. King made a note on this report to call plaintiff and tell her that

---

[6]Mitral valve prolapse occurs when the valve between the heart's left upper chamber (left atrium) and the left lower chamber (left ventricle) does not close properly.

16

her valves were okay, but she had a trace amount of fluid around her heart which could cause some chest pain.

On November 25, 2008, plaintiff returned to Dr. King to follow up on her echocardiogram (Tr. at 345). Dr. King noted she did not have mitral valve prolapse. He prescribed Ultram for chest pain.

On December 8, 2008, plaintiff returned to the ER at St. Joseph Medical Center with reports of chest pain that went through to her back (Tr. at 398-399). She had also felt somewhat short of breath. EKG and chest x-ray were negative. Plaintiff was given morphine and Zofran (for nausea). Clinical impression was chest pain.

Plaintiff returned to the ER on January 26, 2009, reporting chest pain, migraine and vomiting (Tr. at 391-393). EKG and chest x-ray were negative. Plaintiff was given Fentanyl[7] and Zofran without resolution of her headache and chest pain. Clinical impression was chest pain, unknown cause.

On February 10, 2009, plaintiff went to the ER at St. Joseph Medical Center with chest pain and headache (Tr. at 386-388). Michael Feder, M.D., performed a physical exam which revealed some tenderness to palpation in plaintiff's chest but was otherwise normal. CT scans were normal. Dr. Feder reviewed old ER records as well as records from Providence - St. Margaret Health Center. He spoke with plaintiff's internist, Dr. King, who stated that he did "not see [plaintiff] commonly" and was unaware of any cardiac abnormality. Dr. Feder diagnosed headache of uncertain etiology and chest pain, but found no evidence of an underlying medical impairment to explain the cause of pain. Plaintiff was given Toradol (non-steroidal anti-inflammatory) and "some narcotic pain medication" with significant relief of headache and chest pain.

---

[7]A synthetic opiate analgesic similar to morphine.

17

On March 21, 2009, plaintiff returned to the ER at St. Joseph Medical Center and saw Roger Goldenberg, M.D. (Tr. at 384-385). She reported she had been having headaches for several days and then had a seizure that day but she was "back to her normal state." Review of systems and physical examination were normal. Clinical impression was seizure disorder and chronic headaches. She was given two Vicodin tablets for her headache and advised to follow up with Dr. King.

On April 3, 2009, plaintiff was treated by Rebecca Messerli, M.D., at the St. Joseph ER due to non-radiating chest pain (Tr. at 379-380). She reported that she had had this pain many times in the past with no certain cause, and that the pain normally resolved on its own. A review of systems and physical examination were normal, specifically indicating no headaches, seizures, or syncope (fainting). Her current medications were aspirin, nitroglycerin,[8] Topamax, and Ultram. EKG and chest x-rays were negative. Plaintiff was given Fentanyl with no relief, and was then given Lortab (narcotic). The assessment was chest pain; plaintiff was discharged to home.

On April 22, 2009, Richard Kaspar, Ph.D., a State Agency psychologist, performed a case analysis, stating that he did not believe that plaintiff's claim "falls within the mental domain" (Tr. at 360). He noted that plaintiff made no mental allegations in her application for benefits. Brain studies, including MRI and CT scans, have been "remarkably negative," suggesting a "possible psychogenic origin to her alleged seizure-like activity, but the fact that [plaintiff] continues to be treated with Topamax, anti-seizure medication, lends credence to a physical basis for her apparent condition. Dr. Kaspar added that most physicians agree that pseudo-seizures are "a somewhat innocuous condition" and "would be given 'somatoform'[9]

---

[8]A nitrate used to treat heart pain.

[9]A category of psychiatric disorder characterized by conversion of emotional distress into physical symptoms or by symptoms of physical illness that have no discernible organic cause.

18

consideration . . . only if and after, neurologic consideration and treatment had been ruled out and ceased." He noted that the record contained occasional references to stress and anxiety, but such references were "clearly insufficient" to establish existence of a medically determinable impairment.

On April 28, 2009, Harold Keairnes, M.D., a State Agency physician specializing in internal medicine, reviewed the evidence of record, noting that there was "[l]ittle objective evidence" of plaintiff's allegations and "no record of observed seizure activity" (Tr. at 361-362). Dr. Keairnes thought that plaintiff's primary problem was migraine headaches and asked for a "completed migraine/headache questionnaire" to obtain additional information.

On May 4, and May 11, 2009, plaintiff completed "headache questionnaire" form, reporting that she had headaches "every second of the day since June 2007" (Tr. at 205, 208). She stated that the pain is located "all over [her] head" and "never goes away, no matter what" medications she took. Plaintiff also asserted that the headaches caused her to have seizures.

On May 17, 2009, plaintiff went to the ER at St. Joseph Medical Center with cough and headache and was treated by Thomas Deskin, M.D. (Tr. at 368-369). Exam of her lungs revealed some rhonchi. Head CT was normal. The impression was bronchitis and headaches. She was given Zithromax (an antibiotic) and Dilaudid (narcotic).

May 29, 2009, is plaintiff's alleged onset date.

Plaintiff returned to the ER on May 31, 2009, and saw Dr. Goldenberg (Tr. at 363-364). According to her husband, she had some chest pains that day and then had a 12-minute seizure. Dr.

Goldenberg observed that plaintiff was "very well known" to the emergency department because of her monthly visits for seizures, chest pains, and headaches of unknown etiology.

---

Hypochondriasis is classified as a somatoform disorder.

Plaintiff "apparently" had three seizures in a row in the emergency department and then refused to answer questions and acted postictal, but suddenly became alert and interrupted Dr. Goldenberg when he made statements she disagreed with. Plaintiff complained that she could not move her arm, but Dr. Goldenberg observed that she had no difficulty moving it in response to pinches and other painful stimuli. An ECG and laboratory testing were normal. Plaintiff complained of significant stress but declined Xanax (treats anxiety). "I feel patient's seizures are most likely pseudo-seizures in etiology. I do not feel that patient is having centralized seizures, at least what I was able to see in the Emergency Department. The patient also is complaining of paralysis in that right arm, but again she was able to move it to painful stimuli when I pinched her." Dr. Goldenberg assessed atypical chest pain, seizures "most likely pseudo seizures in etiology" and migraine headaches ("The patient began complaining of a headache asked for pain pills."

On June 11, 2009, plaintiff went to the ER at St. Luke's East with a headache causing light sensitivity and dizziness for three days (Tr. at 535-537). Dawna McCulloch, M.D., diagnosed headache not otherwise specified and gave plaintiff Ultram. Plaintiff was discharged three hours after her arrival.

On June 30, 2009, plaintiff was treated by Sarah Linderman, M.D., at St. Luke's East ER due to chest pain and moderate headache that she had had for four days (Tr. at 526-527). A physical exam was normal. Dr. Linderman diagnosed acute headache and told plaintiff to follow up with neurology.

On July 1, 2009, plaintiff underwent head CT to evaluate her complaints of headache (Tr. at 558-559). The results were essentially normal.

That same day Jeffrey Wheeler, M.D., a State Agency physician, affirmed the November 2007 RFC assessment after reviewing all of the evidence in plaintiff's file (Tr. at 456-462). Dr. Wheeler observed that plaintiff's primary care treatment records did not reflect any evidence

20

of seizures, and plaintiff had not been under any regular specialty care.  Although she claimed disability due to seizures, she "seems quite functional - she drives" and goes "to work every day."

On July 25, 2009, plaintiff went to the ER at St. Joseph Medical Center and was treated by Jeffrey Althoff, M.D. (Tr. at 556-557).  Plaintiff reported a migraine for the past four days as well as recurring episodes of chest pain.  Dr. Althoff assessed acute migraine headache and gave plaintiff an injection of Dilaudid before discharging her in good condition.

On August 25, 2009, Dr. King completed a Medical Source Statement of physical work-related impairments (Tr. at 560-563). He reported he first saw plaintiff in September 2006, and saw her most recently the day he completed the Medical Source Statement. Plaintiff weighed 225.8 pounds and stood five feet six inches tall.  Brain CT on July 1, 2009, showed frontal sinusitis and normal brain.  Dr. King indicated he prescribed Topamax to plaintiff and said her medication was effective but she was unable to afford it without health insurance. Her prognosis was "good."  He stated that plaintiff could lift up to 10 pounds continuously, 20 pounds frequently, and up to 50 pounds occasionally.  She could sit a total of six hours, stand for a total of four hours, and walk for a total of two hours in an eight-hour day; but could not ever sit, stand or walk at one time without interruption.[10]  She could never climb or stoop; and could occasionally balance, crouch, kneel, crawl, and push/pull.  She should avoid all exposure to heights, moving machinery, vibrations, noise, dust, fumes, odors, smoke and temperature extremes.  Dr. King did not believe plaintiff could perform the above physical activities eight hours per day in a competitive work setting with no more than one day's absence per month due to illness.  He stated she had a medical need to lie down at unscheduled

---

[10]The form asked how many hours total in an eight-hour work day plaintiff could sit, stand or walk.  The form then asked "at one time without interruption" as to each of those three functions, and Dr. King circled "zero" as to all three (Tr. at 561).

intervals during the day. She suffered pain and fatigue/reduced stamina that would significantly reduce her ability to function in the workplace.

## V. FINDINGS OF THE ALJ

Administrative Law Judge George Bock entered his opinion on November 3, 2009 (Tr. at 9-15).

Step one. Plaintiff has not engaged in substantial gainful activity since her amended alleged onset date (Tr. at 11). she worked after her originally alleged onset date at the substantial gainful activity level from November 2008 through June 2009 (Tr. at 11).

Step two. Plaintiff suffers from migraines and pseudo seizure disorder, severe impairments (Tr. at 11).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 11).

Step four. Plaintiff's subjective allegations of disabling symptoms are not credible (Tr. at 12-13). She retains the residual functional capacity to perform the full range of work at all exertional levels but cannot work at heights or around dangerous machinery or where she would be exposed to extremes of heat or cold (Tr. at 12). Plaintiff is capable of performing her past relevant work as a certified nurse's assistant (Tr. at 13).

Step five. Alternatively, plaintiff can perform other jobs available in significant numbers in the economy, such as office helper, photocopy machine operator, and electrical assembler (Tr. at 14).

## VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir.

22

1999); <u>McClees v. Shalala</u>, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. <u>Hall v. Chater</u>, 62 F.3d 220, 223 (8th Cir. 1995); <u>Robinson v. Sullivan</u>, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. <u>Robinson v. Sullivan</u>, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the <u>Polaski</u> opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> Although claimant alleges disability, the evidence demonstrates that she has retained a significant work capacity despite her alleged symptoms and limitations. The evidence describes frequent seizures and headaches, but EEGs have been normal, as have CT scans of the brain and a MRI of the cervical spine. There are also inconsistencies in the record. For instance, a May 2009 emergency room note stated, "[She] apparently h ad 3

23

seizures in a row in the emergency department and was acting as if she was post-ictal, but then when I began to say things about her, she woke up and said, 'No, that's wrong' and corrected some of the things I was saying. [She] would flutter her eyes multiple times. [She] also states that she could not move her arm, although when I pinched her arm, she moved it away from pain." And another report stated, "EEG is [negative], so she has pseudo seizures. [But] There is no treatment for pseudo seizure except for psychiatric evaluation." However, in an evaluation, Dr. Richard Kaspar PhD said there was no evidence of record of a medically determinable mental or emotional impairment, save for an "occasional reference to stress, anxiety and the like." There is no evidence of significant or disabling adverse side effects of medication, and claimant has a somewhat limited work history characterized by low earnings and a number of job changes suggesting that claimant is not highly motivated for long-term, permanent employment. Claimant has also worked during the period pertinent to this decision, earning income at substantial gainful activity levels; she also drives, cares for small children, and keeps house, all of which demonstrates a fairly good level of activity inconsistent with disability due to frequent seizures or migraine headaches.

(Tr. at 13).

Plaintiff argues that normal results on diagnostic tests should not be used to discredit her, as normal physical and neurological findings are consistent with pseudo-seizures. An ALJ may not discount allegations of a disabling impairment solely on the lack of objective medical evidence, but a lack of objective medical evidence is a proper factor for an ALJ to consider in determining a claimant's credibility. Forte v. Barnhart, 377 F.3d 892, 895 (8th Cir. 2004) (citing Tennant v. Apfel, 224 F.3d 869, 871 (8th Cir. 2000)); 20 C.F.R. §§ 404.1529 and 416.929. As the ALJ noted, despite plaintiff's subjective complaints of seizures and frequent headaches, results of repeated objective diagnostic tests were completely normal.

Plaintiff claimed that she had headaches "every second of every day since June of 2007." Yet, as the ALJ noted, her treating doctor reported that medication effectively controlled her symptoms. "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010) (quoting Brace v. Astrue, 578 F.3d 882, 885 (8th Cir. 2009)). Although Dr. King added that plaintiff could not always take her medication due to financial constraints, there is no evidence in the record to show that during the relevant period, plaintiff was unable to get medication. In

24

Riggins v. Apfel, 177 F.3d 689 (8th Cir. 1999), the Eighth Circuit noted that "although Riggins claims he could not afford such medication, there is no evidence to suggest that he sought any treatment offered to indigents."

Although plaintiff claimed to suffer a continuous headache since 2007, she worked at the substantial gainful activity level through May 2009. The record contains no credible evidence to show that her alleged seizures or headaches have become increasingly frequent or severe since then. Where an individual has worked with an impairment over a period of years, absent significant deterioration, it cannot be considered disabling at present. Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992); Van Vickle v. Astrue, 539 F.3d 825, 830 (8th Cir. 2008) ("Thus, despite suffering from what she calls 'extreme fatigue,' Van Vickle continued working for over four years"). Plaintiff continued working as a certified nurse assistant on a part-time basis after her amended alleged onset of disability. Work performed during any period in which plaintiff alleges that she was under a disability may demonstrate an ability to perform substantial gainful activity. 20 C.F.R. §§ 404.1571 and 416.971; Naber v. Shalala, 22 F.3d 186, 188-89 (8th Cir. 1994).

In assessing plaintiff's credibility, the ALJ also observed that plaintiff's activities of daily living were inconsistent with her claims of disability due to seizures and migraines. She was able to drive, care for small children, and keep house, all of which demonstrates a fairly good level of activity inconsistent with complaints of frequent seizures, around-the-clock headaches, and an inability to work. The inconsistencies between plaintiff's subjective complaints and her daily activities diminish her credibility, and may be relied upon by the ALJ. Riggins v. Apfel, 177 F.3d at 692. Plaintiff's ability to engage in many normal daily living activities "further confirms" the ability to work on a daily basis in the national economy. Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (citing Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000)).

Moreover, as the ALJ noted, plaintiff's behavior during emergency room visits suggested that she may have been less-than-forthcoming about her symptoms. She reported frequent seizures, but as Dr. Keairnes observed, the record contains no documentation of observed seizure activity by a medical professional. In the ER, plaintiff acted as if she were in a compromised post-seizure state, but she became alert and communicative when a physician made comments with which she disagreed. Though she reported paralysis in her arm, the physician obviously doubted that claim and he observed plaintiff move her arm away from pain.

Other evidence suggesting that plaintiff tended to stretch the truth supports the ALJ's credibility finding. Plaintiff testified under oath that she went to the hospital for seizures at least four times a month. Though she was a frequent ER visitor, her visits were not weekly. Likewise, plaintiff testified that she saw her primary care physician twice a month for the past five years; however, Dr. King said he did not see plaintiff commonly; in June 2009, Dr. King's office reported that he had not seen plaintiff in at least six months. There are no treatment records from Dr. King during the relevant period. During the alleged period of disability, plaintiff sought treatment only from the ER and she ignored ER physicians' repeated instructions to follow up with her primary care physician. "A failure to follow a recommended course of treatment also weighs against a claimant's credibility." Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005).

The ALJ also noted plaintiff's poor work history, characterized by low earnings and frequent job changes, suggesting that plaintiff was not motivated for long-term employment. The Eighth Circuit has noted that "[a] lack of work history may indicate a lack of motivation to work rather than a lack of ability." Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001) (citing Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir.1993) (claimant's credibility is lessened by a poor work history)).

26

Credibility questions concerning a claimant's subjective testimony are "primarily for the ALJ to decide, not the courts." Baldwin v. Barnhart, 349 F.3d 549, 558 (8th Cir. 2003). When the ALJ articulates inconsistencies that undermine a claimant's subjective complaints, and when those inconsistencies are supported by the record, the ALJ's credibility determination should not be disturbed. Eichelberger v. Barnhart, 390 F.3d at 590 ("We will not substitute our opinion for that of the ALJ, who is in a better position to assess credibility"). The ALJ outlined good reasons for discounting plaintiff's subjective allegations and relied on substantial evidence in the record in doing so; therefore, plaintiff's motion for judgment on this basis will be denied.

## VII. DEVELOPING THE RECORD

Plaintiff argues that the ALJ erred in failing to develop the record regarding plaintiff's mental impairment: "Based on Dooley's diagnosis of pseudo seizures, the ALJ should have further developed the record regarding a mental impairment."

At no point did plaintiff allege that she was disabled because of a mental impairment. At no point during the relevant period did plaintiff seek treatment for a mental impairment. Plaintiff's significant other completed a Function Report - Third party on October 20, 2007, stating that plaintiff's headache pain causes her disability including "loss of memory do [sic] to pain." (Tr. at 164-171). He indicated that her ability to pay attention is tied to how much pain she is in. Plaintiff's daughter completed a Function Report - Third Party on March 11, 2009, and repeatedly stated that plaintiff's daily activities were limited by pain, not by depression or any other mental impairment (Tr. at 188-195). Accordingly, the ALJ had no duty to inquire further. Plaintiff's allegation of a mental impairment did not arise in her case until she had lost on her original position. The ALJ is not obliged "to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability." Mouser v. Astrue, 545 F.3d 634, 639 (8th Cir. 2008) (quoting Pena v. Chater, 76 F.3d 906, 909 (8th

Cir. 1996)); 20 C.F.R. §§ 404.1512(a) and 416.912(a) ("We will consider impairment(s) you say you have or about which we receive evidence").

Plaintiff states that the ALJ ignored evidence in the record indicating that she had been treated for depression. Indeed, a single treatment record from September 2006 shows that Dr. King assessed depression and prescribed Lexapro. The fact that plaintiff had been prescribed antidepressants on a single occasion, nearly three years before the alleged period of disability, is hardly evidence to show a severe mental impairment or to require the ALJ to inquire further into the condition by ordering a psychological evaluation. Hensley v. Barnhart, 352 F.3d 353, 357 (8th Cir. 2003). Furthermore, Dr. King does not mention depression in the Medical Source Statement he completed in 2009, which suggests that any symptoms he had identified in 2006 were not ongoing or had no impact on plaintiff's ability to function.

Plaintiff states that the ALJ ignored the fact that pseudo-seizures are considered a psychiatric disorder which should be managed by a mental health professional. However, plaintiff never sought treatment from a mental health professional. No physician ever referred her for mental health treatment. The Eighth Circuit has held that allegations of disabling symptoms may be properly discounted because of inconsistencies such as minimal or conservative medical treatment. Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997). Plaintiff argues that the ALJ improperly relied exclusively on a State agency psychologist's opinion in finding that plaintiff had no severe mental impairment. However, the ALJ's decision shows that he carefully considered all of the evidence of record in making his findings. State agency medical consultants are highly qualified physicians who are experts in Social Security disability evaluation. See 20 C.F.R. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(ii); SSR 96-6p. After reviewing the evidence of record, Dr. Kaspar stated that plaintiff's claim did not fall within the mental domain. He noted that plaintiff had made no mental allegations, per se, and the fact that she continued to be treated with Topamax lent credence to the fact that there was

28

a physical basis for her apparent condition. He further noted that pseudo-seizures were an innocuous condition that would be given somatoform consideration as a mental impairment only if and after neurologic treatment had been ruled out and ceased. The ALJ did not err in properly considering Dr. Kaspar's expert opinion or in finding no severe mental impairment. Casey v. Astrue, 503 F.3d 687, 694 (8th Cir. 2007); SSR 96-6p. There is no credible evidence of record to show that plaintiff may have been disabled due to a mental impairment; therefore, plaintiff's motion for judgment on this basis will be denied.

## VIII.    OPINION OF DR. KING

Plaintiff argues that the ALJ erred in failing to give controlling weight to the opinion of Dr. King in the Medical Source Statement in which he found that plaintiff would miss more than one day of work per month due to her condition, that she had a medical need to lie down at unscheduled intervals during the day, and that she suffered pain and fatigue/reduced stamina that would significantly reduce her ability to function in the workplace. Plaintiff contends that the medical evidence "strongly supports" a finding that plaintiff could not maintain a full-time work schedule. She points to treatment records documenting her multiple ER and doctor visits to show her inability to work full time, but neglects to acknowledge that she was, in fact, working at the substantial gainful activity level at the time of those visits.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give the opinion: (1) the length of the treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the

29

opinion with the record as a whole, and (6) specialization of the doctor. 20 C.F.R. §
404.1527(d)(2) - (5).

After determining plaintiff's residual functional capacity, the ALJ had this to say about
Dr. King's opinion:

> In making this determination, the undersigned has considered the medical source
> statement of Dr. Russell King MD who concluded that claimant's impairments would
> prevent her from completing an ordinary work day or workweek. However, this
> opinion is not supported by the underlying treatment notes or Dr. King's own medical
> source statement which indicates that claimant's conditions are controlled with
> medication but that claimant cannot always take her medication due to financial
> constraints.

The ALJ properly discounted Dr. King's opinion because it was not internally consistent,
nor was it supported by the record or treatment notes. Although a treating physician's opinion
concerning an applicant's functional limitations is generally entitled to substantial weight, it
"does not automatically control or obviate the need to evaluate the record as a whole." Brown
v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004) (internal quotation omitted); see also SSR 96-
2p (stating that controlling weight may be given only in appropriate circumstances, and may
not be given unless the opinion is well-supported by medically acceptable clinical and
laboratory diagnostic techniques and is "not inconsistent" with the other substantial evidence
in the case record). As the Eighth Circuit has stated, an ALJ may discount or even disregard the
opinion of a treating physician where other medical assessments are supported by better or
more thorough medical evidence, or where a treating physician renders inconsistent opinions.
Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010).

In this case, the ALJ carefully considered Dr. King's opinion and found that it was not
consistent. Dr. King noted significant limitations, yet he also stated that plaintiff's prognosis
was good and her symptoms were effectively controlled with medication. This alone is a
sufficient basis for the ALJ to discount Dr. King's opinion. See Goff v. Barnhart, 421 F.3d 785,
790–91 (8th Cir. 2005) ("[A]n appropriate finding of inconsistency with other evidence

alone is sufficient to discount the opinion"). Moreover, the opinion was not supported by treatment records. In her brief, plaintiff noted meetings with Dr. King for complaints of headache and syncope between 2007 and May 2009. Yet, as noted above, plaintiff worked at the substantial gainful activity level during this period, and on a part-time basis thereafter. There are no documents in the record to suggest that Dr. King ever treated plaintiff during the relevant time period. The ALJ's assessment of Dr. King's opinion was proper; therefore, plaintiff's motion for judgment on this basis will be denied.

## IX.    PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY

Plaintiff argues that the ALJ erred in failing to consider plaintiff's obesity and evidence that she had suffered a knee injury. Plaintiff's argument is without merit.

"It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his limitations." Pearsall v. Massanari, 274 F.3d 1211, 1217-1218 (8th Cir. 2001) (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)). But "[i]t is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." Pearsall v. Massanari, 274 F.3d at 1217 (citing Anderson v. Shalala, 51 F.3d at 779). Plaintiff has provided no credible evidence to establish that during the relevant period of consideration, she had any functional limitations attributable to her obesity or knee injury.

The record contains a letter from a physician to a lawyer stating that plaintiff injured her knee while working at K-Mart in December 2006, and plaintiff complained of a "bad knee" when she applied for a hearing in January 2008. However, the record contains no evidence of treatment for a knee injury during the relevant period; and, as Dr. Keairnes noted, there is "[n]o objective support for [plaintiff's] allegations of knee problems." Moreover, there is no medical evidence of record to suggest that plaintiff's sprained knee remained symptomatic. Likewise, there is no credible evidence of record to establish that during the

31

relevant period of consideration, plaintiff had any functional limitations attributable to her obesity.

Though plaintiff criticizes the ALJ for allegedly failing to account for her obesity and knee problems in the residual functional capacity, she fails to identify any specific limitations caused by her obesity or alleged knee problems.  See Robson v. Astrue, 526 F.3d 389, 393 (8th Cir. 2008) ("Robson claimed that her obesity exacerbated her existing medical infirmities, but she does not explain how including her obesity would change the question to the VE."); Forte v. Barnhart, 377 F.3d 892, 896 (8th Cir. 2004) ("Although his treating doctors noted that Forte was obese and should lose weight, none of them suggested his obesity imposed any additional work-related limitations, and he did not testify that his obesity imposed additional restrictions.").  The ALJ's residual functional capacity assessment was supported by substantial evidence.

## X.    CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's decision finding plaintiff not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.

_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
July 12, 2012